IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RAYMOND-CARLOS QUINONEZ, | No. C 09-4272 SBA (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| KELLY HARRINGTON, | |
| Respondent. | |

# INTRODUCTION

Petitioner seeks federal habeas relief from his state convictions. For the reasons stated herein, the petition for such relief is DENIED.

# BACKGROUND

In 2004, a Santa Cruz County Superior Court jury convicted Petitioner of conspiracy to commit robbery, attempted robbery, and other offenses related to his use of pipe bombs. After appeal and resentencing, Petitioner's final term was 23 years and 8 months.[1] This federal habeas petition followed Petitioner's exhaustion of state judicial review.

Evidence presented at trial demonstrated that in October 2001, Petitioner and his co-conspirators

> planted a number of pipe bombs by schools and other public places in the City of Watsonville. They then telephoned authorities to report the bombs and, while law enforcement was occupied investigating the bomb threats, they entered a business in a different part of town, pointed a semi-automatic handgun at the employees, and demanded cash.

---

[1] As a result of his first appeal, the state appellate court remanded for resentencing after it concluded that state law prohibited punishment for conspiracy and the bomb-related counts part of the conspiracy. As a result of his second appeal, the state appellate court stayed the imposition of a sentence on one conviction. (Ans., Ex. 17 at 37–38; Ex. 26 at 9.)

(Ans., Ex. 26 at 1.)

As grounds for federal habeas relief, Petitioner claims that (1) his statements were taken in violation of his privilege against self-incrimination and his right to due process;[2] (2) the exclusion of reference to penalty violated fundamental fairness or due process; (3) insufficient evidence supports his conviction for making false bomb reports; (4) the denial of work/good time credits violates due process; (5) imposition of multiple terms and of consecutive terms violates Petitioner's rights to jury trial, proof beyond a reasonable doubt, liberty and due process; (6) there was a conflict of interest where the prosecutor and Petitioner's court-appointed attorney both belonged to the same state bar; and (7) the prosecutor failed to inform Petitioner of the nature and cause of the accusation in violation of due process.[3]

## DISCUSSION

### I. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a

---

[2] This is a consolidation of all petitioner's claims regarding the inculpatory statements he made to police.

[3] Claim 8 in the amended petition is conclusory and undetailed. It is DENIED as it does not meet the specificity requirements of Mayle v. Felix, 545 U.S. 644, 655 (2005).

1  procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393
2  F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that
3  was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43
4  (2003).

5      The Ninth Circuit has applied section 2254(d) to a habeas petition from a state prisoner
6  challenging the denial of parole. See Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1126-
7  27 (9th Cir. 2006); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam);
8  McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that
9  AEDPA deferential standard of review under § 2254 applies to such decisions).

### A. Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

#### 1. Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."

3

1   Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that
2   controls on the legal issue raised by a petitioner in state court, the state court's decision cannot
3   be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g.,
4   Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

   The fact Supreme Court law sets forth a fact-intensive inquiry to determine whether
constitutional rights were violated "obviates neither the clarity of the rule nor the extent to
which the rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at
391.  There are, however, areas in which the Supreme Court has not established a clear or
consistent path for courts to follow in determining whether a particular event violates a
constitutional right; in such an area, it may be that only the general principle can be regarded
as "clearly established."  Andrade, 538 U.S. at 64-65.  When only the general principle is
clearly established, it is the only law amenable to the "contrary to" or "unreasonable
application of" framework.  See id. at 73.

   Circuit decisions may still be relevant as persuasive authority to determine whether a
particular state court holding is an "unreasonable application" of Supreme Court precedent or
to assess what law is "clearly established."  Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th
Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir.
1999).

### 2. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state
court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of
law or if the state court decides a case differently than [the Supreme] Court has on a set of
materially  indistinguishable facts."  Williams, 529 U.S. at 413.  A "run-of-the-mill state-court
decision" that correctly identifies the controlling Supreme Court framework and applies it to
the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to'
clause."  Williams, 529 U.S. at 406.  Such a case should be analyzed under the "unreasonable
application" prong of § 2254(d).  See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir.

2000).

### 3. "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard. Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point). After Andrade,

> [T]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

Id. In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.   Section 2254(d)(2)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

**I.   Self-Incrimination Claims**[4]

Ten days before the offenses were committed, Petitioner had telephoned police to inform them that he saw a woman brandishing a knife. The police later discovered that this telephone number matched the one used by the person who had informed police about the pipe bombs. After this discovery, the police asked Petitioner to come to the station for an interview regarding the unrelated knife-brandishing incident Petitioner had reported days earlier. He was informed that he was not under arrest:

> In the course of his videotaped interview with [police on October 31, 2001], [Petitioner] admitted that he had made the bomb reports. He was thereupon arrested and taken into custody. [On November 2] . . . [Petitioner] was interviewed again and he ultimately revealed that he and [co-conspirator] Garcia had constructed and planted the pipe bombs in order to distract law enforcement during the planned robbery.

(Ans., Ex. 17 at 5.) To clarify, at his first interview, he was not given his Miranda[5] warnings.

---

[4] This section address Claims 1, 2, and 3 listed in the amended petition.

[5] Under Miranda v. Arizona, 384 U.S. 436, 444 (1966), a person subjected to custodial interrogation must be advised that he has the right to remain silent, that statements made can be used against him, and that he has the right to counsel. These warnings must

6

1    During that interview he started making inculpatory statements. Police then gave him the
2    Miranda warnings and the interrogation continued. At the second interview, the police read
3    Petitioner his Miranda rights at the start of the interrogation. (Id. at 7–12.)
4         Petitioner claims that (a) his pre-Miranda and (b) post-Miranda statements are
5    inadmissible because they were the product of coercion and promises of leniency and were
6    made after he invoked his right to silence.

### A.     Pre-Miranda Statements

The state appellate court rejected this claim regarding his pre-Miranda statements "because even if [Petitioner's] initial admission should have been excluded for lack of Miranda warning[,] his later statements contain the same admission, i.e., that he was the one who reported the bombs." (Ans., Ex. 17 at 18.) In reaching its decision, the state appellate court relied on Oregon v. Elstad, 470 U.S. 298 (1985). (Id.)

In Elstad, the Supreme Court found that absent "actual coercion," the taint of statements "technically in violation of Miranda" may be purged by a subsequent, voluntary Miranda waiver. 470 U.S. at 309, 318. The voluntariness of the subsequent confession should be considered under a multi-factor test, examining: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second confession, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. Missouri v. Seibert, 542 U.S. 600, 615 (2004) (plurality opinion). Although the Seibert plurality did not explain which criterion in its multi-factor test should weigh most heavily, it noted that the two ultimate questions are, "Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to

---

precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. Id.

stop talking even if he had talked earlier?" Id. at 611–612.

As noted above, the two interrogations at issue occurred over the course of two days. The first took place on October 31, 2001 at the police station and was conducted by Officer Stackhouse, who was joined later in the interview with Officer Joseph. The second interrogation occurred on November 2, 2001 at the Santa Cruz County Jail and was conducted by officers Joseph and Prigge, who were later joined by Assistant District Attorney Brayton. On such facts, the state appellate court reasonably determined that the change in time (roughly two days), place (police station, jail), and interrogating officers (Stackhouse and Joseph, then Joseph, Prigge, and Brayton) removed any taint from the second confession. There was sufficient separation in time and circumstances to allow Petitioner to consider his rights, the circumstances he found himself in, and how he wanted to proceed. Such determination, therefore, also reasonably answers at issue in Seibert. The warnings would effectively advise Petitioner that he had a real choice and convey that he could stop talking even though he had talked earlier.

Petitioner faults the state appellate decision for failing to address Seibert. The Court construes this to mean that the court failed to address whether police engaged in a two-stage interrogation technique. A two-stage interrogation occurs when police deliberately withhold Miranda warnings until the interrogant confesses. See Seibert, 542 U.S. at 610. The concern is whether later-given Miranda warnings would sufficiently protect an interrogant, or whether "the earlier and later statements are realistically seen as parts of a single, unarmed sequence of questioning." Id. at 612.

In the instant matter, there is no evidence of a deliberate two-step strategy. Petitioner does not cite to the record or present any evidence in support of his assertion that the first interrogators deliberately withheld their Miranda advisement until he had incriminated himself. Moreover, unlike the defendant in Seibert, Petitioner was not under arrest at the start of the first interview. There is no evidence in the record concerning an official police policy of deliberately withholding Miranda warnings until a suspect has confessed. In contrast to the

police officers in Seibert, the inspectors here did not testify that they withheld Miranda warnings until after Petitioner confessed. Under these circumstances, the state appellate court's analysis under Elstad was not an unreasonable application of the law.

Petitioner also contends that his pre-Miranda confession was involuntarily obtained through the use of coercion and promises of leniency:

> [Petitioner] cites Stackhouse's remarks that he did not care about [Petitioner] but only about the cell phone [used to make the bomb threats], his remarks that the caller would be treated less harshly than the actual bomber, references to [Petitioner]'s parole status, and his statement that if he found the phone and whoever had the phone "you will probably go right back home and go to sleep," as promises not to arrest [Petitioner] or as guarantees to treat him more leniently if he revealed what he knew.

(Ans., Ex. 17 at 18–19.) The state appellate court's factual determination that Stackhouse's statements did not constitute promises is entitled to a presumption of correctness. Not only has Petitioner entirely failed to present any evidence in rebuttal, the record shows that Stackhouse repeatedly said he could not make any promises. Also, Petitioner's own statements show that he was not coerced or misled by promises, but rather was "knowledgeable and sophisticated":

> [Petitioner] assured Stackhouse, "I want to cooperate," "I gave you the best I could," "I'm being cooperative." He offered to draw a map to York's place. He also pointed out to Stackhouse that he was "talking to you without even having my rights read" and "I know I'm not under arrest. I could just say, you know what, fuck it. I'm not going to talk to you." He had timed the pre-Miranda interview. Then, after admitting the phone call, he attempted to dissuade the officers from reading the Miranda warning, assuring them that he would not raise the Miranda issue to exclude evidence at trial. Finally, after the warning was read, [Petitioner] confirmed that he could "stop any time."

(Ans., Ex. 17 at 19.)

Finally, his assertion that police impermissibly continued to question him after he invoked his right to silence does not withstand scrutiny, as the state court reasonably determined:

> The only pre-Miranda remark that [Petitioner] claims invoked the right was his statement to Stackhouse, "I ain't got nothing to say." In context, however, the remark is plainly not an indication that [Petitioner] wanted to terminate the interview. Stackhouse asked [Petitioner]: "What are you going to tell me about this and whose [sic] involved?" To which, [Petitioner] replied: "I ain't got nothing to say, but I mean . . . I wasn't involved in it." "I ain't got nothing to

9

say" means only that [Petitioner] has nothing to say "about this and whose [sic] involved." Indeed, he promptly clarified the point when he added that he was not involved and immediately went on to implicate [another person whose name was] York.

. . . .

[Petitioner] argues that after he made the first admission, his interviewers ignored him when he again invoked his right to remain silent. The trial court found that the statements [Petitioner] cited were merely expressions of frustration. The record supports this conclusion.

After [Petitioner] admitted making the phone call, Stackhouse wanted to bring Joseph into the interview. [Petitioner] replied, "I'm already funked. Just by saying that. It's just . . . that's it. I know I'm tired. I'm . . . shut it down." Stackhouse interpreted the remark as indicating that [Petitioner] did not want to talk if the detective was going to join them, so he told [Petitioner], "I'll just talk with you." [Petitioner] relented and said, "send them in . . . I mean" to which Stackhouse said, "if you're going to shut down I don't want to." [Petitioner] told Stackhouse to send the detective in. "I'll talk 'em." Thus, "shut it down" did not mean that [Petitioner] wanted to terminate the interview as [Petitioner] now contends. Rather, the statement shows that he was frustrated with knowing that he had just implicated himself in the plot and did not want to deal with an officer he did not know and trust. Moreover, Stackhouse did not ignore the remark but offered to keep Joseph out of it.

According to [Petitioner], he also invoked his right to silence when he said to Stackhouse: "I won't say nothing until the court process," "take me [to] county jail chief. I'm through with this shit," "I'll fight that in fucking court," and "I'm through with you." Again, read in context, there is nothing about these remarks that indicates a desire to terminate the interview. The first two quotes are taken from [Petitioner]'s remarks made in response to Stackhouse's effort to read him the <u>Miranda</u> warning. Rather than indicating a desire to stop the interview, the comments seem to be a threat that [Petitioner] would stop talking if the officer read the warning.

The latter quotes were made at the end of the Stackhouse interview as part of the following exchange . . . This exchange shows, if anything, that [Petitioner] had made the preceding admission in the hope of being granted some benefit and was expressing his frustration that now the interview was over, it was time to leave and take him to jail, and he was not getting anything in exchange for his cooperation.

(Ans., Ex. 17 at 20–22.) The above quotation supports the state appellate court's determination. For example, (1) Stackhouse stated he was willing to end the interview ("shut it down") if Petitioner did not want to talk to the other officer; (2) Petitioner indicated that he wanted to continue talking, but only to Stackhouse; and (3) Petitioner tried to stop Stackhouse from reading the <u>Miranda</u> warnings. Rather than indications of involuntariness, they show a knowing and sophisticated person, perfectly aware of his rights, and how to invoke them.

10

Accordingly, all claims regarding his pre-Miranda statements are DENIED.

### B. Post-Miranda Statements

Involuntary or coerced confessions are inadmissible at trial, Lego v. Twomey, 404 U.S. 477, 478 (1972), because their admission is a violation of a defendant's right to due process under the Fourteenth Amendment, Jackson v. Denno, 378 U.S. 368, 385–86 (1964). A confession is involuntary if it is not "'the product of a rational intellect and a free will.'" Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)). A "necessary predicate" to finding a confession involuntary is that it was produced through "coercive police activity." Colorado v. Connelly, 479 U.S. 157, 167 (1986). Coercive police activity can be the result of either "physical intimidation or psychological pressure." Townsend, 372 U.S. at 307. Whether a confession is involuntary must be analyzed within the "totality of the circumstances." Withrow v. Williams, 507 U.S. 680, 693 (1993). The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age. See id. at 693–94.

The first part of Petitioner's claim regarding his post-Miranda statements — that his second confession was tainted by the first — has been resolved above. As to the second part — that his second confession was involuntary — the state court reasonably determined that the statements were voluntarily given:

> We find no error in the trial court's conclusion. In the first place, the promised benefits — one month's rent money, help with housing for [Petitioner]'s family, and protective custody for [Petitioner] in state prison — are not the type of benefits that are generally considered to affect the voluntariness of a statement.
>
> Second, although some promises of leniency may be implied in Brayton's remarks, the promises do not appear to have coerced [Petitioner]'s decision to cooperate. There is ample evidence to support the court's finding that [Petitioner] was willingly attempting to negotiate for his cooperation. [Petitioner] dangled the first carrot: "I got inside information on all of this shit." He indicated that he was willing to talk in exchange for some advantage: "I don't want to waste your guys' time either, but, ah, . . . I want to come up with something realistic." And he was the one who requested the particular benefits that were ultimately offered. His active role in the negotiation is further

11

> demonstrated by his remark, made shortly before he began describing his involvement in the scheme, that if he waited much longer, the police would obtain all the information they needed from other sources. That is, [Petitioner] agreed to talk when he did because he realized that if he waited any longer he would lose all his bargaining power.

(Ans., Ex. 17 at 22–23.) The reasonableness of the state appellate court's decision is supported by, for example, Petitioner's sophisticated, assertive role in the discussions. There is no persuasive evidence that the confession was involuntary, or that his will was overborne. Accordingly, Petitioner's claim is DENIED.

## II. Exclusion of References to Punishment

The trial court "allowed the jury to hear all the circumstances surrounding the [Petitioner]'s incriminating statements except references to [Petitioner]'s prior strike and [police officer] Brayton's mention of a 30-year sentence," out of concern that "these references would prompt the jury to think about punishment." (Ans., Ex. 17 at 23.) Here, Petitioner claims that the references to punishment show the pressure police applied to make him confess, and that he was promised no more than a 30-year sentence.

The state appellate court concluded that the trial court did not abuse its discretion in excluding such evidence, and rejected Petitioner's claim:

> The trial court's concern was that evidence of [Petitioner]'s potential punishment could taint the jury's consideration of guilt in spite of an instruction to the contrary. The court did allow the other circumstances of the interview to come into evidence and permitted [Petitioner]'s counsel to elicit evidence from the prosecution witnesses that promises were made prior to [Petitioner]'s giving a full statement. Evidence of the specifics of [Petitioner]'s potential punishment adds very little to the subject.

(Id. at 24.)

The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37, 43 (1996) (quotation omitted). The defendant, not the state, bears the burden to demonstrate such a violation. Id. at 47 (internal quotations and citations omitted). "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are

disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South Carolina, 547 U.S. 319, 326 (2006).

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, a reviewing court balances five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000).

Petitioner's claim lacks merit. Under the Chia factors, there is no doubt that the evidence was reliable and that it was capable of evaluation by the jury. Its probative value, along with its value under the other facts, is lacking. The trial court's decision to exclude references to penalty because it was more prejudicial than probative is well-supported by case law:

> It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.' Rogers v. United States, 422 U.S. 35, 40 (1975). The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion. [Citations omitted.]

Shannon v. United States, 512 U.S. 573, 579 (1994). Given this clearly-established policy, the state appellate court reasonably determined that the trial court did not violate Petitioner's due process rights by excluding reference to penalty. Petitioner's argument that such references were necessary to show that his confession was involuntary is unavailing. As

noted by the state appellate court, trial counsel was able to present such evidence through other means. On such a record, Petitioner's claim is DENIED.

### III.  Sufficiency of Evidence

Petitioner claims, without elaboration, that there was insufficient evidence to support his convictions for making false bomb reports under California Penal Code § 148. Petitioner provides no specifics as to the basis for his claim. It appears from the state appellate court opinion that Petitioner contends that because he made the false reports to a police dispatcher rather than to a police officer, the evidence was insufficient to support his conviction.

This claim is without merit. The state appellate court ruled that false bomb reports to a police dispatcher qualify as violations of § 148. This Court is bound by the state appellate court's interpretation of its state's laws. Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Accordingly, this claim is DENIED.

### IV.  Denial of Work-Time Credits

Petitioner's claim consists solely of the following: "The erroneous denial of presentence work/good time credits violates the due process clause of the 5th and 14th amendment."

This claim is DENIED for two reasons. First, Petitioner's conclusory allegations do not meet the specificity requirement for habeas claims. Felix, 545 U.S. at 655. Second, an independent review of the record shows that there is no evidence that Petitioner's rights were violated. At sentencing, the trial court "awarded [Petitioner] 966 days of presentence custody credit [ ] but denied him any good-time or work-time credits." The state appellate court concluded that the undisputed record fully supported the trial court's decision:

> There is no dispute that [Petitioner] failed to comply with the reasonable rules of the jail. While in custody in the county jail [Petitioner] was housed in the maximum security unit. The jail commander wrote in April of 2003, over a year before trial, that [Petitioner] was classified as requiring maximum security because he had been "routinely threatening and non compliant with the Correctional Officers. He has refused direct and lawful orders from Officers and has put himself and Officers in a position of having to use force to gain compliance." By the time the case came to trial the prosecutor had filed two felony charges against [Petitioner] for obstructing, or resisting jail personnel, threats, and violence. [Citation omitted.] [Petitioner] made threats during trial.

> At sentencing, there were 28 new reports of misconduct that occurred since trial began.

(Ans., Ex. 17 at 31.) Petitioner has provided nothing to set against this record, nor made any arguments to overcome the deference this Court owes to the state appellate court's determination. Accordingly, this claim is DENIED.

## V.     Imposition of Consecutive and Multiple Terms[6]

Petitioner's claim regarding the imposition of consecutive terms violates his Fifth, Sixth, Fourteenth Amendment rights and is unavailing. "The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994). More specifically, Sixth Amendment jury trial protections do not apply to a trial court's decision to impose concurrent or consecutive sentences, see Oregon v. Ice, 129 S. Ct. 711, 714–15 (2009), a point of law that defeats Petitioner's Fifth Amendment argument. Accordingly, all his claims are DENIED.

As regards his multiple term claim, Petitioner also claims that his four convictions for the reckless or malicious possession of an explosive device near a public place (Cal. Penal Code § 12302.2) should be treated as one offense. The trial court, according to Petitioner, violated his rights under California Penal Code § 654 by imposing multiple terms. The state appellate court rejected this claim because California law "defines the unit of possession in singular terms," a person, like Petitioner, who "possesses more than one unlawful item" is "subject to multiple convictions." (Ans., Ex. 17 at 29.)

Petitioner's claim fails for two reasons. First, it is a state law claim. Whether his convictions constitute one or four offenses is a matter of state law. The state appellate court's interpretation on this point binds this federal habeas court. Richey, 546 U.S. at 76. Also, an alleged violation of state law, here § 654, is not remediable on federal habeas review, even if state law were erroneously interpreted or applied. See Swarthout v. Cooke, 131 S. Ct. 859,

---

[6] This section addresses Claims 6 and 7 in the amended petition.

15

1  861–62 (2011). Second, the claim fails even if construed as a federally cognizable
2  insufficiency of evidence claim. A rational juror could find Petitioner guilty beyond a
3  reasonable doubt of the four charged offenses based on the evidence that he possessed four
4  devices at four separate locations. Jackson v. Virginia, 443 U.S. 307, 324 (1979). Because
5  such a conclusion does not fall below the threshold of bare rationality, Coleman v. Johnson,
6  No. 11-1053, slip op. 7 (U.S. May 29, 2012), the claim is DENIED.

## VI. Conflict of Interest

Petitioner's entire claim is: "Petitioner assert[s] that there was a 'conflict of interest' between the court appointed attorney and the prosecutor as both were members of the same 'state bar.'"

Petitioner's claim lacks merit. He has in no way shown that "(1) his counsel actively represented conflicting interests; and (2) an actual conflict of interest adversely affected counsel's performance." Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999) (citations omitted). A claim that a conflict produced adverse impact is not made out by simply claiming such; Petitioner must show that it had an impact that "significantly worsens counsel's representation of the client." United States v. Mett, 65 F.3d 1531, 1535–36 (9th Cir. 1995). No such showing has been made. This claim is DENIED.

## VII. Indictment

Petitioner's entire claim is that the "prosecutor failed to inform Petitioner of [the] 'nature and cause' of his accusations. This violated the right[ ]s of the Petitioner (5th & 14th Amend.) Due Process."

This claim is DENIED for two reasons. First, Petitioner's conclusory allegations do not meet the specificity requirement for habeas claims. Felix, 545 U.S. at 655. Second, an independent review of the record shows that there is no evidence that Petitioner's rights were violated. Specifically, the informations the prosecutor filed describe the charges in a way that complies with due process notification requirements. (Ans., Ex. 1 at 417–23, 442–33, 490–97, 505–12, 614–21.)

## CONCLUSION

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

DATED: 8/17/12

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

RAYMOND-CARLOS QUINONEZ,

        Plaintiff,

v.

HARRINGTON et al,

        Defendant.

Case Number: CV09-04272 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 20, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Raymond-Carlos Quinonez E-15587
Salinas Valley State Prison
P.O. Box 1050
Soledad, CA 93960-1050

Dated: August 20, 2012

Richard W. Wieking, Clerk
By: Lisa Clark, Deputy Clerk

G:\SBALC2\Keith\Prisoner\aaaaa.frm      18